

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| v. § | **CASE NO. 1:05-CR-33(2)** |
| § | |
| **GARY MALLOY** § | |

**FINDINGS OF FACT AND RECOMMENDATION
ON MOTION TO SUPPRESS**

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court, Eastern District of Texas, the District Court referred this matter to the undersigned magistrate for a hearing and the submission of findings of fact and a report and recommendation on *Defendant's Motion to Suppress* [Clerk's doc. #112].

 **A.** **Background**

 i. The Charges

Defendant, Gary Lynn Malloy, is facing charges alleged by the two-count *First Superseding Indictment*, returned by a federal grand jury on April 6, 2005 [Clerk's doc. #66]. Count 1 charges that from a time beginning on February 1, 2005, and continuing to on or about February 16, 2005, in the Eastern District of Texas and elsewhere, Mr. Malloy and other defendants did knowingly conspire, combine, confederate and agree with persons known and unknown to the Grand Jury, to

possess with intent to distribute a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in an amount of 5 kilograms or more, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

Count 2 charges that on or about February 16, 2005, Gary Lynn Malloy and another defendant did knowingly and intentionally possess with intent to distribute a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in an amount of 5 kilograms or more, in violation of Title 21, United States Code, Section 841(a)(1). The First Superseding Indictment also contains a notice of intention to seek forfeiture under 21 U.S.C. § 853(a).

    ii.    Recitation of Facts and Evidence Presented[1]

Special Agent Dan Bieri is a Special Agent with the United States Immigration and Customs Enforcement (ICE) and is currently assigned to a long-term narcotics and money laundering investigative group. Agents with ICE were conducting an investigation on a target in Houston, Texas. The agents then developed confidential source information which led them to an additional target who was transporting large loads of cocaine from Houston, Texas to Georgia and North Carolina. The confidential source indicated that the narcotics and currency derived from the sale of those narcotics, were transported in welded compartments or in welding tanks.[2] According to the informant, Target "A" and Target "B" were transporters for Target "C". ICE agents have verified the accuracy of the information provided by this confidential informant by surveillance and

---

[1] At the hearing, the Government offered two witnesses, Special Agent Bieri and Sergeant Sorge, and certain exhibits into the record in support of the legality of the evidence. Here, the Court summarizes the witnesses' testimony (both on direct and cross-examination) as set forth in the record of the hearing on the *Motion to Suppress*.

[2] Special Agent Biery received this information from another agent sometime during the summer months of 2004.

research and feel that the informant is reliable and credible. According to Special Agent Bieri, this informant continues to provide accurate information to ICE agents.

On October 7, 2004, ICE agents decided to conduct surveillance on Target "A". Agents observed Target "A" travel from his residence in Channelview, Texas to a residence located at 17305 River Road, Channelview, Texas. Agents observed several vehicles at this residence and saw welding being performed on a large gooseneck trailer. Two vehicles located at this residence, a white Ford Expedition and a gold Chevrolet Corvette, were determined to be associated with Gary Malloy.

Surveillance was continued the next day on October 8, 2004 on the residence located at 17305 River Road. The Expedition and the Corvette were again located at the home and agents also observed welding operations taking place. In addition, ICE agents also observed two white pickup trucks which were also determined to be associated with Gary Malloy at the residence.

Surveillance was again conducted on January 5, 2005, this time at Target "A"'s residence. Agents observed one of the white pickups associated with Malloy in the driveway of the home.

In the afternoon hours of January 5, 2005, ICE agents observed the other white pickup associated with Malloy at the residence located at 17305 River Road.[3] This particular vehicle is registered Southern States Fabricators which is a company owned by Gary Malloy. A database check initiated by ICE agents revealed that Target "A", Gary Malloy, and another individual were registered as co-owners of a company. The investigation also revealed that Malloy resided at 822 Benz Lane in Huffman, Texas. ICE agents conducted surveillance at Malloy's residence and

---

[3] This was identified as the vehicle which was subsequently stopped for traffic violations in Orange County, Texas.

observed the Expedition and Corvette which had previously been seen at the River Road address while welding was taking place.

On January 20, 2005, ICE agents continued to conduct surveillance at 17305 River Road, Channelview, Texas and observed that one of the white pickups associated with Gary Malloy was present. Agents also observed a white Nissan Altima and a gray Ford Focus. Agents observed the Ford Focus leave the residence and travel to several locations throughout Houston, Texas. This particular vehicle was stopped by sheriff's deputies and consent was received to search the Ford Focus. During the search, deputies discovered $99,770 in United States currency. The currency was wrapped in cellophane and there was an oily substance between the layers of cellophane, which was used as a masking agent to deter drug detection dogs. The currency was bundled with different colors of rubber bands which, according to Special Agent Bieri, is consistent with narcotics trafficking. The three individuals traveling in the Ford Focus did not claim ownership of the currency and denied knowing who owned the money.

On February 14, 2005, ICE agents conducted surveillance once again at 17395 River Road. Agents observed a white pickup depart the River Road residence and eventually travel to 644 Wallaceville Road in Liberty, Texas. The pickup parked near a large metal building that was located on the property and the two male occupants exited the pickup and covered up the windows of the building with what appeared to be plywood. A red Chevrolet Blazer arrived at the residence and a record check revealed that this vehicle had crossed into the United States from Mexico on the previous day. The red Blazer backed into the garage and the doors to the garage were closed. Agents believed that the Blazer contained narcotics. The white pickup left the Wallaceville Road residence and agents followed it to Gary Malloy's residence located at 822 Binz Lane. A male

exited the pickup and knocked on the door at Malloy's residence. No one answered the door at Malloy's house so the truck departed and agents followed it to the residence of another target in the investigation. Approximately two hours later, agents observed a Volkswagon depart this residence and travel back to Malloy's residence. Agents then followed the Volkswagon to the residence located at 644 Wallaceville Road.

ICE agents re-established surveillance at 644 Wallaceville Road at approximately 3:30 a.m. on February 15, 2005. At approximately 6:30 a.m. that morning, agents heard the sound of mechanical work being performed in the metal building. Officers observed the Volkswagon leave the residence, drive a few miles down the road, stop, and return to the residence. Later that day a white pickup truck with a welding machine arrived at the residence and the pickup backed approximately half way into the metal building. Agents could hear the sounds of welding and could smell the welding fumes. After the welding ceased, the white pickup was backed into the metal building and the doors were shut. While the welding truck remained in the building, agents observed another white pickup leave the residence and travel to 822 Binz Lane, then to another target's residence, then back to Binz Lane, and return to 644 Wallaceville Road..

On February 16, 2005 agents observed a White Ford Expedition drop Gary Malloy off at the residence located at 644 Wallaceville Road.[4] Malloy was carrying a black bag and went into the house. Approximately twenty minutes later, the doors to the metal building were opened and the welding truck drove out of the building. The agents followed the welding truck as it traveled on Interstate 10 toward Beaumont, Texas and advised the ICE duty agent in Beaumont of the situation.

---

[4] This was the same Ford Expedition which had been parked at the River Road residence when welding was being performed.

The ICE duty agent was advised that the Houston agents had conducted surveillance on a vehicle that had recently crossed the Mexican border, that welding was ongoing, and that narcotics were suspected of being in a compartment in the welding truck.

The ICE duty officer in Beaumont then contacted Sgt. Tracy Sorge of the Orange County Sheriff's Department.  Sgt. Sorge was working narcotics interdiction on Interstate 10 in Orange County, Texas.  The duty officer asked Sorge to attempt to stop the welding truck, identify the occupants, and proceed to investigate the matter at his discretion.  Sorge was not specifically told about the possible presence of drugs in the welding cylinders or in welded compartments.

Sorge has worked for the Orange County Sheriff's Department for twelve years and has been working narcotics for six of those years.  He has completed 400 hours of specialized training in drug interdiction.  For reasons which will become apparent later in this report, it should be noted that Sorge has previously obtained a certificate in welding from Lamar Institute of Technology in the fall semester of 2002.

Sorge observed the welding truck traveling on Interstate 10 in Orange County at approximately 6:45 a.m.  Sorge followed the truck for a short distance and observed three traffic violations.[5]  Sorge then activated the emergency lights on his patrol vehicle and stopped the welding truck.[6]

Sorge made contact with the driver of the welding truck, later identified by his Texas

---

[5] Sorge observed two unsignaled or improperly signaled lane changes and a failure to maintain a single lane of travel which occurred when the welding truck was passing a slower moving vehicle.  Malloy is not complaining about the propriety of the initial stop.

[6] Sorge's patrol vehicle contained a dash-mounted video camera and a videotape of the traffic stop was admitted into evidence at the hearing as Government's Exhibit #1.  A transcript was admitted as Government's Exhibit #2.

driver's license as Marcos Santana, and asked him to step to the rear of his vehicle. As he was completing a warning citation, Sorge questioned Santana. Santana advised Sorge that he was traveling to Chattanooga, Tennessee to do some welding. Santana stated that he was employed as a welder's helper with Pabsco Industries or Pabsco Company. Sorge's suspicions were aroused due to the fact that the placard on the side of the welding truck read "Southern States Fabrication". Santana told Sorge that he (Santana) had traveled from his residence in Channelview, Texas to the passenger's residence, also located in Channelview, that morning, and had driven his Ford F-150 pickup. When asked about the welding truck he was driving, Santana stated that it was a company truck but he had never seen it around the shop before. Santana later stated that he had previously seen the truck but had only been employed by the business for four or five days. Santana told Sorge who had hired him but Sorge felt that Santana was fabricating the name due to his apparent difficulty in remembering. Sorge noted that Santana was nervous to the extent that his voice was breaking and his hands were shaking. When Sorge asked Santana to step back toward the patrol car while Sorge talked to the passenger, Santana "assumed the position" on the side of the patrol car, which made Sorge suspicious.

Sgt. Sorge then went to the passenger side of the welding truck to make contact with the passenger and attempt to obtain insurance papers and registration. Sorge noted that when he initially made contact with the occupants at the passenger window and asked Santana to exit the vehicle, the passenger appeared to be awake and alert. At this time, the passenger acted as though he were asleep. Sorge identified the passenger of the welding truck as the Defendant, Gary Malloy. Malloy tendered the insurance papers to Sorge. The documents indicated that the vehicle was

registered to Malloy.[7] Upon questioning, Malloy stated that he lived in Huffman, Texas, which conflicted with Santana's statement that Malloy lived in Channelview. Malloy stated that he and Santana were going to Chattanooga, Tennessee to change out gaskets for a pipeline check station. Sorge asked Malloy if he had an office manifest in reference to that job. Malloy stated that he did and that Sorge could call the office and speak to "Bobby". Sorge stated that he would call. Malloy then recanted and said that in fact he was the superintendent for the job crew. According to Sorge, Malloy appeared to be extremely nervous (his hands shook badly) and he continuously tried to light a cigarette throughout his conversation with Sorge, although Sorge had instructed him not to smoke.

Sorge then asked Malloy (the registered owner of the truck) for consent to search.[8] Malloy gave consent and Sorge's partner began to search the passenger compartment of the welding truck. Sorge began his search at the rear portion of the bed of the truck, initially focusing on two oxygen bottles laying horizontally in the bed of the truck. Sorge noticed that there was fresh paint overspray on the fall caps of the oxygen bottle.[9] Sorge thought that this was unusual.[10] Sorge also noted that the texture of the oxygen bottle was inconsistent in that the upper portion of the bottle was smooth in texture while the lower portion of the cylinder appeared pitted from several layers

---

[7] This conflicted with Santana's statement that the vehicle was a company truck. Upon questioning, Malloy wavered back and forth on whether the truck was his or was owned by the company.

[8] Sorge admitted under cross-examination that, at this specific point in time, he did not feel that he had probable cause to search the welding truck.

[9] An oxygen cylinder has over 2000 lbs of pressure. However, the threads on the valves unable to withstand a sudden impact if the cylinder is dropped. *Id.* A "fall cap" is a cap that screws down over the oxygen valve to protect it.

[10] Sorge explained that if you ever had to "redo" the oxygen cylinder the paint would increase the chances of contaminating the cylinder when an oxygen regulator is screwed into the oxygen cylinder. Contamination would damage the valve and the regulator and otherwise slow the welding process.

of paint

Due to the conditions described *supra*, Sorge opined that the oxygen cylinder had been cut and re-welded, with the lower portion of the bottle containing contraband and the upper portion containing pressurized air. Sorge unscrewed the fall caps and examined the oxygen valves. He noticed that the valves were new and had new Teflon which indicated that someone had just recently installed the valves. Sorge then opened the oxygen valves on the left and right tank and noted that the pressure of the tanks was not consistent with the 2200 - 2500 psi needed for welding purposes. In addition, Sorge noted that the gas in the cylinders smelled like compressed gas from a gas station and not like pure oxygen which came from a welding supply store. Sorge then closed the valves and re-attached the fall caps. Sorge told Malloy that he felt that the oxygen cylinders contained contraband and, at this point, asked if Malloy wanted to cooperate.[11]

Sorge knew that the weight of the cylinders, depending on the class, should be between 137 lbs to 144 lbs and that the weight should be distributed equally. Sorge further noted that the weight of the oxygen cylinders appeared to be concentrated near the bottom of the cylinders, therefore, the cylinders did not contain a full volume of gas. Sorge then used a pocket knife to scratch the paint on one of the cylinders which revealed "Bondo" on the tank.[12] Sgt. Sorge then realized that the cylinders were useless for welding purposes in that "Bondo" can only withstand about 53 lbs of pressure.

Realizing that there was a compartment within the cylinders which possibly contained contraband, Sorge handcuffed Santana and Malloy. Sorge then took a screwdriver and removed

---

[11] During this time period, Sorge received consent from Malloy to have the cylinders x-rayed. However, x-rays were never performed. *Id.*

[12] "Bondo" is an automotive body filler.

portions of the Bondo which revealed welded seams in oxygen cylinders. Believing the upper portion to contain pressurized air and the lower portion to contain contraband, Sorge bled the pressurized air from the cylinders. The welding truck was then driven to a mechanic's shop.[13] At the shop, a metal dowel rod was inserted into one of the cylinders and it was determined that the cylinder contained a welded diaphragm separating the two compartments within the cylinder. Sorge realized that he could not open the cylinder with a cutting torch without possibly destroying evidence contained within the cylinder. Sorge tried using a metal grinder to open the cylinder but the metal was too thick. He then decided to utilize a metal chop saw and cut just below the welded seam on the cylinder to access the bottom portion of the tank.[14] Sorge discovered that the bottom portion of each cylinder contained thirteen square kilogram-sized bundles of cocaine.[15]

    iii.    Defendant's Motion and the Government's Response

Pursuant to Rule 41(h) of the Federal Rules of Criminal Procedure[16], Defendant brings his *Motion to Suppress* all evidence any and all tangible evidence seized by law enforcement officers or others in connection with or as a result of the allegedly illegal search of the Defendant's vehicle. Mr. Malloy also filed his *Brief in Support* of the *Motion to Suppress* [Clerk's doc. #113]. In his

---

[13]    Santana and Malloy were transported to the Orange County Jail by another officer.

[14]    Sorge testified that, by cutting the cylinders open, he did not destroy the cylinders for their intended use because the previous modifications actually made to the cylinders in the construction of the compartments made the cylinders useless for their intended use, that is, the storage of pressurized oxygen for welding purposes.

[15]    The total weight of the suspected cocaine recovered from the two cylinders was approximately 72 lbs.

[16]    "A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides." FED. R. CRIM. P. 41(h). Federal Rule of Criminal Procedure 12 enumerates the procedure and form for conducting a suppression hearing, and provides that a suppression motion must be made before trial, that the court must rule upon the motion before the trial, that the hearing on such a motion must be recorded and that statements may be produced at the hearing in accordance with Federal Rule of Criminal Procedure 26.2. *See* FED. R. CRIM. P. 12.

brief, Malloy alleges that the search of the cylinders was unreasonable because it exceeded the scope of his consent to search. *Brief,* at p.7. Malloy argues that Sorge never received consent to search the oxygen tanks which would then render the cylinders useless. *Id.* at p.8. Malloy argues that he merely gave consent to search the truck, and did not give consent to the officers to utilize a chop saw to open the cylinders. *Id.* He urges this Court to follow the rationale of the Tenth Circuit Court of Appeals in *United States v. Osage*, 235 F.3d 518 (10th Cir. 2000)(officers exceeded scope of consent to search suitcase by opening sealed cans of food items). Malloy also notes that the Eleventh Circuit Court of Appeals has held that consent to search a vehicle does not permit police to cut open a spare tire within the automobile. *See United States v. Strickland*, 902 F.2d 937 (11th Cir. 1990). He further discusses the Fifth Circuit Court of Appeals approval of that proposition in *United States v. Ibarra*, 948 F.2d 903, 907 (5th Cir. 1991). In a closely related argument, Malloy contends that the cutting open of the cylinders exceeded the scope of his express consent to have them x-rayed. *Brief*, at p.10.

  The Government filed its *Response to Defendant's Motion to Suppress* [Clerk's doc. #124], arguing that the Fourth Amendment does not require that the police obtain a search warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity, citing *United States v. Ross*, 456 U.S. 798, 804 - 809 (1982). Going further, the Government notes that if officers possess probable cause to search a vehicle, they may search closed containers within the vehicle capable of concealing the object of the search, citing *California v. Acevedo*, 500 U.S. 565, 580 (1991). The Government also argues that if probable cause existed to search the cylinders at the scene of the traffic stop, officers had the right to perform the same probable cause search of the cylinders at the mechanic's shop, citing *Chambers v. Maroney*, 399

U.S. 42 (1970) and *United States v. McSween*, 53 F.3d 684, 689 (5th Cir. 1995), *cert. denied* 516 U.S. 874 (1995). The Government argues that, based on the totality of the circumstances, probable cause existed which allowed Sorge to open the cylinders.

Malloy responds in arguing that the Supreme Court's opinion in *Chambers* contained the caveat that the probable cause search of the vehicle at the police station was permissible *unless* the Fourth Amendment permits a warrantless seizure of the vehicle and the denial of its use to anyone until a warrant is secured. Malloy notes that the probable cause seizure of vehicles became permissible seven years later when the Supreme Court decided *G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977). Malloy therefore suggests that after *G.M. Leasing* was decided in 1977, the Supreme Court would require that Sorge obtain a warrant because the vehicle was seized and not a "fleeing target" inaccessible to Santana and Malloy.

Malloy also responds that *Chambers* has been limited by the Fifth Circuit's opinion in *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979) (holding that once authorities are in control of situation, they must obtain a warrant to search luggage or similar property). He contends that once the cylinders were seized and the defendants were in custody, the automobile exception to the warrant requirement was vitiated.

On October 26, 2005, the Court conducted a hearing on the suppression motion in the manner and form mandated by the Federal Rules of Criminal Procedure. Having heard the evidence and for the reasons set forth herein, the Court recommends the motion be denied.

**B.**     **Legal Analysis**

Under the Fourth Amendment, "[t]he standard for measuring the scope of a suspect's consent ... is that of objective reasonableness – what would the typical reasonable person have

Case 1:05-cr-00033-TH   Document 157   Filed 12/05/05   Page 13 of 17   PageID #: 595

understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248 (1991). "Although an individual consenting to a vehicle search should expect the search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts, or contents." *United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990); *see also Arizona v. Hicks*, 480 U.S. 321, 324 (1987) (seizure of property occurs when the government intrusion "meaningfully interferes" with individual's possessory interest). When the justification for the search is based on consent, the Government has the burden of proving that the search was conducted within the scope of the consent received. *United States v. Ibarra*, 965 F.2d 1354, 1356 n.2 (5th Cir. 1992).

In this instance, Malloy not only gave a general consent to search his vehicle, but he also specifically consented to having the oxygen cylinders x-rayed. A consensual search is confined to the terms of its authorization. *United States v. Strickland,* 902 F.2d 937, 941 (11th Cir. 1990). The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant. *Id.* If the Government does not conform to the limitations placed upon the right granted to search, the search is impermissible. *Id.*

Under the circumstances of this case, a police officer could not reasonably interpret the general consent to search the vehicle to include the cutting open of the welding cylinder. In addition, it is apparent from the record that Malloy only gave consent to have the cylinders x-rayed, not cut open. Therefore, the Government cannot properly base the search of the oxygen cylinders upon Malloy's consent to search the welding truck or on his specific consent to have the cylinders x-rayed.

However, this Court's analysis does not end there. This is because Sorge's observations

during the consensual search, taken in conjunction other facts in this matter, gave him probable cause to believe that there was contraband in the oxygen cylinders, thus lawfully expanding the scope of the search under the automobile exception to the warrant requirement. *United States v. Ross*, 456 U.S. 798, 823 (1982).

It is well-settled that warrantless searches of an automobile are permitted by the Fourth Amendment if law enforcement officers have probable cause to believe that the vehicle contains contraband or other evidence of a crime. *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995), *cert. denied* 516 U.S. 874 (1995). The police may search an automobile and the containers within it where they have probable cause to believe contraband or other evidence is obtained. *California v. Acevedo*, 500 U.S. 565, 580 (1991). Probable cause to search exists where the known facts are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found. *United States v. Saucedo - Munoz*, 307 F.3d 344, 351 (5th Cir. 2002). Whether an officer has probable cause to search a vehicle depends on the totality of the circumstances viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the search. *Id.* In determining whether probable cause exists, each individual layer of information is not to be weighed. *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005). Rather, the "laminated total" of the facts available is the source of the justification for a search. *Id.* (Citiations ommitted).

In this case, the ICE duty agent asked Sgt. Sorge to stop the vehicle and conduct his investigation. Santana was apparently confused as to the name of the company that he worked for and was extremely nervous, to the point of "assuming the position" to be searched even though he was not requested to do so. Malloy stated that he lived in Huffman which conflicted with Santana's

statement. Mr. Malloy also appeared to be extremely nervous. Viewing the oxygen bottles, Sorge immediately noticed that something was amiss. Sorge noticed the fresh overspray and the apparent existence of several layers of paint. He also noticed that the oxygen bottles had new valves, did not contain the necessary pressures to be utilized for welding purposes, and contained gas which smelled like compressed gas instead of pure oxygen. Sorge discovered that the weight distribution of the bottles appeared to be concentrated at the bottom of the cylinders. This Court is convinced that based upon these circumstances, given the specialized training that Sorge has received in narcotics and welding, constitute probable cause which allowed Sorge to lawfully cut open the oxygen cylinders to remove the contraband. *See United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000)(probable cause allowed officers to cut open spare tire).

Finally, Malloy's argument that Sorge needed a search warrant to search and open the cylinders once the vehicle and the defendants were seized is not persuasive. If probable cause justified a warrantless search on the roadside, it is likewise justified at a police station after the vehicle is impounded. *See United States v. McSween*, 53 F.3d 684, 689 (5th Cir. 1995), *cert. denied* 516 U.S. 874 (1995).

The probable cause which existed to open the cylinders at the scene of the traffic stop still existed when the cylinders were transported to the maintenance shop to be cut open. Malloy's reliance upon his reading of the dicta in *Chambers* is unpersuasive. In *Chambers*, the Supreme Court did note, in dicta, that a subsequent search at the police station is proper unless the Fourth Amendment allows a warrantless seizure of the vehicle and the denial of its use to anyone until a warrant is obtained. *Chambers*, 399 U.S. at 50-51. However, the Court went on to state that, even in such a situation, there is little to choose from in practical consequences between an immediate

search without a warrant and the car's immobilization until a warrant is obtained. *Id.*

In addition, Malloy's reliance upon *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979), is misplaced. In *Johnson*, the Fifth Circuit Court of Appeals based their decision on the Supreme Court's holding in *United States v. Chadwick*, 433 U.S. 1 (1977). However, in the *Acevedo* decision, the Supreme Court analyzed the conflict between the *Chadwick* rule and the doctrines set forth in *Carroll v. United States*, 267 U.S. 132 (1925), and concluded that one, and only one, rule now applies to the search of a vehicle and the containers found within it. *Acevedo*, 500 U.S. at 580. The police may search a vehicle and all containers within it if they have probable cause to believe contraband or other evidence is contained. *Id.* In applying this rule, the Court must overrule Mr. Malloy's arguments and find that probable cause existed to support the search and cutting open of the containers on his vehicle

### C. Conclusion and Recommendation of the Court

Accordingly, having considered the factors and evidence presented, and based upon the facts and conclusions law stated herein, the undersigned magistrate recommends that the District Court deny Defendant's *Motion to Suppress* [Clerk's doc. #112].

### D. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and

legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415 (5th Cir. 1996) (*en banc*); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

**SIGNED this the 5th day of December, 2005.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE